UNITED STATES of America, Plaintiff,

v.

Harold E. FORD, Douglas R. Beaty, Karl A. Schledwitz and David A. Crabtree, Defendants.

No. 87–20193.

United States District Court,
W.D. Tennessee,
W.D.

April 10, 1991.

Gary Humbel, Chattanooga, TN, Dan Clancy, Jackson, TN, for U.S.

William McDaniels, Williams & Connolly, Washington, DC, J. Alan Hanover, Memphis, TN, for Congressman Harold Ford.

Kemper Durand, Memphis, TN, for Douglas Beaty.

Herbert Moncier, Ann Short, Knoxville, TN, for Karl Schledwitz.

Anthony Lomonaco, Knoxville, TN, for David Crabtree.

## MEMORANDUM AND ORDER ON PENDING MOTIONS

HORTON, Chief Judge.

Defendants' individually, or by joinder, filed the following motions in this case for resolution by this Court:

Motion to dismiss the indictment because there was no manifest necessity for the declaration of a mistrial by the Court and, therefore, a retrial would violate the defendants' rights under the double jeopardy clause of the Constitution of the United States.

Motion for judgment of acquittal.

Motion to renew the motion for disclosure of the Grand Jury testimony of Special Agent Donald MacDonald, Federal Bureau of Investigation.

The government moved the Court for an order protecting the integrity of the jury selection process.

The Court rules on the motions in the sequence in which the motions are listed.

*Manifest Necessity*

It has long been established in the constitutional jurisprudence of this nation that a federal trial judge may discharge a jury before a verdict is reached, even over the objection of a defendant, where there is a manifest necessity for its declaration or if the ends of public justice would otherwise be defeated.

In 1824, 167 years ago, the Supreme Court of the United States ruled:

We think that in all cases of this nature, the law has invested Courts of Justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all of the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes.

*United States v. Perez*, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824).

In 1971, the Supreme Court restated the important constitutional policy of finality in federal criminal trials:

The Fifth Amendment's prohibition against placing a defendant twice in jeopardy represents a constitutional policy of finality for the defendant's benefit in federal criminal proceedings. A power in government to subject the individual to repeated prosecutions for the same offense would cut deeply into the framework of procedural protections which the Constitution establishes for the conduct of a criminal trial. And, society's awareness of the heavy personal strain which a criminal trial represents for the individual defendant is manifested in the willingness to limit the Government to a single proceeding to vindicate its very vital interest in enforcement of criminal laws.

*United States v. Jorn*, 400 U.S. 470, 479, 91 S.Ct. 547, 554, 27 L.Ed.2d 543 (1971)

However, on pages 554 and 555 the Supreme Court stated an exception to this constitutional policy of finality in federal criminal cases:

A defendant's valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments.

The Court declared a mistrial in this case and discharged the jury, over the defendants' objections, because of 1) manifest necessity and 2) the ends of public justice.

The graphic demonstration of manifest necessity is reflected by the following sequence of events which occurred in open court:

Wednesday afternoon, April 25, 1990, at 3:10 o'clock p.m., the Court received a note from Mr. H.O. Robinson, foreman of the jury. The Courtroom Deputy Clerk, Mrs. Ann Breaux, read the note to the Court and all attorneys:

THE CLERK: This is the note from the jury:

Judge Horton,

We the jury have come to order and is now ready to return a verdict at 2:45. Thank you. J. Ruffin, Secretary.

H.O. Robinson, Foreman.

(Tr. p. 40)

The Court thereupon requested the Deputy United States Marshal to invite the jurors to return to the courtroom whereupon the following transpired:

THE COURT: Marshal, have all of the jurors to take their seats and then have the foreperson come up here to the lectern.

(Jury present at 3:10 p.m.)

THE COURT: Mr. Robinson, would you go ahead and just read the jury's verdicts to all of us, please.

THE FOREMAN: All right, sir. Sir—

THE COURT: Yes, sir.

THE FOREMAN: David Crabtree on Counts One, Five, Six, Seven, and Eight—

THE COURT: Don't go too fast. David Crabtree—

THE FOREMAN: One, Five, Six, Seven and Eight, we have four guilty and eight not guilty.

THE COURT: Wait a minute. Is this the result of the jury vote?

THE FOREMAN: This is the result— let me say this at this time, at this particular time the jury is in a hopeless deadlock as far as coming back with a verdict.

THE COURT: Well, now that means that I need to have you sit down a minute and let me talk with the lawyers.

(Tr. p. 41)

Following extensive discussions with defense and prosecution attorneys, the Court addressed the foreman and jurors. The Court asked the jurors to return the following day and resume their deliberations:

THE COURT: Mr. Robinson and ladies and gentlemen, let me address a few comments to you. You were told during the course of the instructions on the law that jurors should reach unanimous verdicts if they can do so without violence to individual judgment. You might remember that expression. And there's an explanation that this means all twelve jurors must agree on a verdict.

Now what I think I heard Mr. Robinson say was that the jury is hopelessly deadlocked and that it is not possible in your judgment to return a unanimous verdict or verdicts in this case. Now is that what I heard you say?

THE FOREMAN: That is correct, sir. May I—

THE COURT: Now, wait, now, we have to be extremely careful at this point, that is why I have to talk with the lawyers first because there is only so much that I can say to you, and when I say 'you', I mean the whole jury, but I am addressing Mr. Robinson as the foreman.

In the court's judgment, after sitting on this bench right at ten years, it will be ten years May 12th, and after many, many, many, many trials, the court's judgment is that it is far too early for you to report that you are hopelessly deadlocked.

What the court is going to do is ask you to continue with your deliberations. This is a long case, many witnesses, many documents and it takes time.

I recognize that you set an adjournment schedule on the note that you said yesterday you would adjourn, I believe you said at 3:00, that's fine, we will respect that and if you wish to adjourn at this time, we will just lock up the room, put everything back, but we will ask you to come back and resume your deliberations at 9:30 tomorrow morning and we will be here. And as we told you before, there's no compulsion, you take the time you need, but you all have sat here, you have listened to the evidence, you have looked at the witnesses, you have seen and heard everything that went on in this

court, you are intelligent people, you are one of the most attentive juries that we have ever had in this court. So I think that the court is justified in asking you to come back tomorrow and start again.

(Tr. 45, 46, 47)

Later, during the course of the following day, the Court received a note from the jury foreman, Mr. Robinson. The Court, referring to the note, stated:

THE COURT: Well, here's a note from that same educated man saying simply. 'The majority of the jury has voted by secret ballot, nine to three, that it cannot reach a guilty or not guilty verdict without violence to individual judgment.' And he signed it.

(Tr. 164)

Following an extensive conference with the attorneys, the Court addressed the jury:

THE COURT: Mr. Robinson, I read your note today as being as follows: 'Judge Horton, the majority of the jury has voted by secret ballot nine to three that it cannot reach a guilty or not guilty verdict without violence to individual judgment.'

And you signed that note, is that correct?

MR. ROBINSON: Yes, sir.

THE COURT: Absolutely correct?

MR. ROBINSON: Yes, sir.

THE COURT: You've reached a deadlock?

MR. ROBINSON: Yes, sir.

THE COURT: And that's it?

MR. ROBINSON: Yes, sir.

THE COURT: If I ask y'all to deliberate further, do you think there is any hope of reaching a verdict in this case?

MR. ROBINSON: No, sir.

THE COURT: Hopelessly deadlocked?

MR. ROBINSON: It is, sir.

THE COURT: Absolutely?

MR. ROBINSON: Absolutely.

THE COURT: No question about it.

MR. ROBINSON: No question.

THE COURT: Would I be wasting your time to ask you to deliberate further?

MR. ROBINSON: Yes, sir.

Again, the Court conferred with all attorneys and thereafter, out of an abundance of caution, addressed the jurors again.

THE COURT: Mr. Robinson, let me address you one more time. And don't think I'm worrying you to death, please don't think that.

I would ask you once again if in your judgment further deliberations by this jury in this case would be hopeless.

MR. ROBINSON: Yes, sir, I certainly feel that.

THE COURT: Now, let me ask your fellow jurors if they concur to just simply raise your right hand up as I've asked you to do many times before. All but three raised their hands. Apparently, we've got three nonconcurrences, is that correct? You didn't raise your hands.

MR. CLANCY: They didn't hear you.

THE COURT: All I was simply asking you is just whether you agree with what Mr. Robinson said, that's all, nothing more. Okay. All right, I just want to be sure.

And then I had asked you earlier also if further deliberations would be nothing more than á waste of time and you answered that.

MR. ROBINSON: Yes, I think so.

THE COURT: And I think I asked you finally if the words hopelessly deadlocked would be appropriate.

MR. ROBINSON: Those are appropriate words.

(Tr. 182, 183)

▮ Absent the defendant's consent, when a judge believes that a jury is deadlocked, the most critical factor is the jury's own statement that it was unable to reach a verdict. Therefore, before a judge declares a mistrial because of a deadlocked jury, he or she should question the jury, either collectively or individually, to determine whether further deliberation would be helpful. *United States v. Byrski*, 854 F.2d 955 (7th Cir.1988).

■ This Court's inquiry of the jury exceeded by far the inquiry conducted by the trial judge in *United States v. Larry*, 536 F.2d 1149, 1151–1152 (6th Cir.1976) wherein the following occurred:

> After responding to the questions presented by the jury, the court engaged the forelady in the following colloquy:
>
> The Court: Now bearing those questions in mind I don't think that I have helped you much, if any, with the question you have asked because I feel satisfied that I am not permitted to any farther for fear of creating error. Is it your opinion, Madam Forelady, that you will be unable to reach a verdict?
>
> The Forelady: Yes it is.
>
> The Court: And that you are definitely at a deadlock?
>
> The Forelady: Yes sir. We seem to be.
>
> The Court: You seem to be?
>
> The Forelady: Yes.
>
> The Court: Do you think it would continue?
>
> The Forelady: We haven't made any headway at all.
>
> The Court: And has it been, whatever the situation, I don't want to know the numbers, has it been that way from the outset?
>
> The Forelady: Yes, sir.
>
> The Court: And hasn't changed.
>
> The Forelady: No, sir.
>
> The Court: Under the circumstances that here exist I do declare this to be a mistrial ...

In *Larry*, as in this case, defense counsel complained of the trial judge's failure to compel the jury to deliberate further. The *Larry* Court stated at pp. 1153, 1154:

> As to the insistence upon a deadlocked jury being compelled to continue deliberations it has been said that such course of conduct more often than not defeats the ends of public justice; not only will such compulsion needlessly waste valuable judicial resources, it may coerce erroneous verdicts. (Citation omitted).

■ Defendants place substantial reliance upon the time the jury deliberated in this case. Jury deliberations in this case occurred over a period of 2½ days. There is no minimum amount of time a jury must spend in deliberations before a mistrial can be declared. This factor is one which is best left to the determination of the trial judge who was most aware of the circumstances of the trial—*Arnold v. McCarthy*, 566 F.2d 1377, 1387 (9th Cir.1978). This Court certainly did not act in an improvident manner. *United States v. Bridewell*, 664 F.2d 1050, 1051 (6th Cir.1981).

The Court's decision to declare a mistrial in this case met the strict test stated by Justice Thurgood Marshall, dissenting in *Arizona v. Washington*, 434 U.S. 497, 525, 98 S.Ct. 824, 840, 54 L.Ed.2d 717 (1978). Justice Marshall stated:

> What the manifest necessity doctrine does require, in my view, is that the record make clear either that there were no meaningful and practical alternatives to a mistrial, or that the trial court scrupulously considered available alternatives and found all wanting but a termination of the proceedings.

*Arizona*, 434 U.S. at 525, 98 S.Ct. at 840.

*Ends of Public Justice*

■ The Court's decision to declare a mistrial in this case was also supported by its considerations of the ends of public justice. Juror misconduct permeated the trial of this case. Two selected jurors were excused from service on the jury by the Court, after extensive questioning, because of their failure during the jury selection process to answer truthfully questions bearing upon their qualifications to serve as jurors. There were strong indications of improper juror contact with outside persons during jury deliberations. Persons sympathetic to one or more defendants visited the courtroom and, throughout the trial, conducted themselves at times in a discourteous manner, obviously and blatantly attempting to influence the jury, despite the best efforts of the Court to discourage such misconduct. Defense counsel did virtually nothing to assist the Court in this effort. Subsequent interviews with dis-

charged jurors by the FBI revealed evidence not only of possible juror misconduct, but also indicated that problematically two jurors were unwilling to follow the law—even though they had faithfully promised to do so during voir dire. One of the excused jurors indicated there was probably guilt on some counts but she could not vote guilty. One juror was reported asleep under the table in the jury room during deliberations. The jury foreman reported to the Court the jury had reached verdicts. Yet, when asked to read the verdicts, he read, before the Court stopped him, not verdicts but the divided vote of jurors on one defendant.

Considering these circumstances, it is clear to the Court the public's interest in a fair trial designed to end in a just judgment has not been served.

> The Government, like the defendant, is entitled to resolution of the case by verdict from the jury, and jeopardy does not terminate when the jury is discharged because it is unable to agree. Regardless of the sufficiency of the evidence at petitioner's first trial, he has no valid double jeopardy claim to prevent his retrial.

*Richardson v. United States*, 468 U.S. 317, 326, 104 S.Ct. 3081, 3086, 82 L.Ed.2d 242 (1984).

Defendants' motions to dismiss the indictment on double jeopardy grounds as to all defendants are denied. The mistrial was dictated by reasons of 1) manifest necessity and 2) the ends of public justice.

### Motion for Judgment of Acquittal

The Court will approach the various motions for judgment of acquittal by the defendants, and the government's opposition thereto, in the following way:

1) State *generally* the substance of the contentions of the parties as developed by the evidence in this case.

2) State *generally* the substance of the Court's findings and conclusions to the extent the Court deems appropriate to rule on the motions.

### Contentions of the Government

It is generally the contention of the government that Butcher banks made a number of short term 60 to 90 day mostly unsecured phony cash loans in exchange for the Congressman's political influence. The government contends there was never any intent that Congressman Ford would repay these loans. The government contends that as Congressman Ford's political influence grew these loans increased in amount. To accomplish the plan that the loans not be repaid, the loans were rolled over into new notes which capitalized the interest, the effect being the creation of a current *not* past due note. The government contends these loans were shifted from one name to another and from one Butcher bank to another until the loans ended up buried in Southern Industrial Banking Corporation, a non-federally insured state licensed industrial loan and thrift company, more commonly called a finance company.

The government contends this banking procedure was followed as a means of getting money to Congressman Ford and also as a means of hiding these loans from federal bank examiners as the loans moved through the federally insured Butcher banks. The government also contends loans were transferred without recourse.

The government contends that when loans to Congressman Ford exceeded $200,000.00 ($219,225.44) they became critical. At this point, C.H. Butcher, Jr. sought the services of Douglas R. Beaty, David A. Crabtree and Karl A. Schledwitz to find a way to handle this debt.

What was ultimately decided upon was a scheme to organize a Corporation under the laws of the State of Tennessee. The name decided upon was Tenn. Ford, Inc. The concept was that an attorney named Long would be hired to obtain a charter incorporating the entity and Southern Industrial Banking Corporation would make a loan to Tenn. Ford, Inc. The government contends the charter was obtained from the State of Tennessee. An unsecured loan in the amount of $350,000.00 was made to Tenn. Ford, Inc., and these funds were

passed through this shell corporation to Karl A. Schledwitz, who deposited the funds into his Real Estate Account from which, working with Congressman Ford's CPA, Mr. Frank Banks, Congressman Ford's personal debts were paid.

The government contends that while the ostensible purpose of the loan was to pay the pressing obligations of the Ford funeral home, in fact, the money was used to pay off the personal debts of Congressman Ford. It is essentially the position of the government that this was a continuation of payoffs to Congressman Ford and Tenn–Ford, Inc. It was nothing but a shell corporation to funnel these funds to Congressman Ford for his personal benefit.

The government contends that an agreement was reached to form Tenn–Ford, Inc. After the Charter of incorporation was obtained by Mr. Long, the attorney, not much else happened afterwards. In fact, the attorney testified he contacted Mr. Beaty to find out whether he should proceed.

The government contends Tenn–Ford, Inc., obtained the $350,000.00 unsecured loan without any assets. There was no documentation. The note was signed by Doug Beaty as President.

The government contends efforts made by lower level bank employees to collect on the note were stopped. The loan was taken off the list of delinquent loans. When one of the bankers had a demand letter prepared, he was stopped and not allowed to send the letter.

The government contends when the Tenn–Ford loan was discussed with a bank examiner, C.H. Butcher, Jr. said he would take care of it.

The government contends the trustee in Bankruptcy had to obtain a judgment against Tenn–Ford, Inc., in his collection efforts. The trustee finally settled the $350,000.00 loan plus interest and costs for $25,000.00 after Congressman Ford gave a sworn affidavit which the government claims is false.

The government contends letters cited in the indictment were written and mailed in furtherance of the scheme to defraud.

### Contentions of the Defendants

The defendants all deny this was an illegal transaction as contended by the government. The defendants all deny they entered into any conspiracy to defraud any Butcher bank. The defendants deny any conspiracy to commit the offense of mail fraud. They deny any conspiracy to obstruct in any way the Internal Revenue Service in its duty to assess and collect taxes. Defendants emphatically deny the existence of any conspiracy, bank fraud or mail fraud. In fact, the defendants all claim the government's proof disproved any conspiracy, bank fraud or mail fraud.

Defendants claim Tenn–Ford, Inc., was a legitimate Tennessee Corporation and that the $350,000.00 loan was a legitimate business transaction. The defense claims the concept started out as a venture by C.H. Butcher, Jr. to obtain investors who would invest $350,000.00 in N.J. Ford and Sons Funeral Parlor, Inc., in Memphis, Tennessee, in exchange for 51% of the stock in that funeral home allegedly owned by Congressman Harold Ford. Somewhere along the way, the concept of the transaction changed from an investment concept to a loan concept, much to the surprise of Congressman Ford. When this disagreement surfaced, the deal eventually failed because of the collapse of the Butcher banks.

### Conclusion

 It is well established that a trial judge confronted with a Rule 29 motion for judgment of acquittal, Rule 29, Federal Rules of Criminal Procedure, must consider all of the evidence in a light most favorable to the government and grant the motion when it appears to the Court that the evidence is insufficient to sustain a conviction. The government must be given the benefit of all inferences which can reasonably be drawn from the evidence. It is not necessary that the evidence exclude every reasonable hypothesis except that of guilt. *United States v. Adamo*, 742 F.2d 927, 932 6th Cir.1984), *cert. denied*, 469 U.S. 1193, 105 S.Ct. 971, 83 L.Ed.2d 975 (1985).

 The motion for judgment of acquittal must be granted when the evidence,

viewed in the light most favorable to the government, is so scant that the jury could only speculate as to the defendant's guilt; and, is such that a reasonably-minded jury must have a reasonable doubt as to a defendant's guilt. *United States v. Beck*, 615 F.2d 441, 448, (7th Cir.1980).

■ Applying this legal standard to the evidence in this case, as briefly sketched in this part of the Court's memorandum and order, it is obvious the Court can reach only one logical conclusion, that is, the motions for judgment of acquittal must be denied.

*Douglas R. Beaty's Motion, Joined by Congressman Harold R. Ford and David A. Crabtree, To Renew His Request For Disclosure of Special Agent Donald MacDonald's Grand Jury Testimony*

Defendant, Douglas R. Beaty, joined by Congressman Harold Ford and David A. Crabtree, filed a post-trial motion renewing his pre-trial motion requesting the Court to order the disclosure of the grand jury testimony of Special Agent Donald MacDonald, Federal Bureau of Investigation. Mr. Beaty claims he has more than amply demonstrated that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury. Fed.R.Crim.P. 6(e)(3)(C)(ii).

It is the contention of Mr. Beaty that the government, through the testimony of Special Agent MacDonald knowingly presented inaccurate, false and misleading information to the grand jury and thereby caused the grand jury to return the indictment against him and his co-defendants. Mr. Beaty claims the government knew a materially false factual premise existed with respect to Counts 9–19 of the indictment. Mr. Beaty contends the Court should reexamine the grand jury process to determine if the government presented materially false information to the grand jury. Mr. Beaty claims none of the 29 witnesses testifying for the government during the trial testified before the grand jury.

The government has consistently denied that it knowingly presented any false information to the indicting grand jury. The government states that Mr. Thomas DuVoisin, the liquidating trustee for Southern Industrial Banking Corporation, testified before a grand jury in Memphis, Tennessee. Mr. C.H. Butcher, Jr., testified as long as the indicting grand jury wanted to hear him. This, the government contends, shows that Special Agent MacDonald was not the only witness to appear before the grand juries investigating this case. In addition, Mr. Dan Clancy, Assistant United States Attorney, stated the indictment in this case was approved at the highest levels of the Department of Justice in Washington, D.C.

Upon consideration of the motion, the Court concludes the same should be denied as to all defendants for the same reasons stated by the Court in its order filed September 1, 1989.

■ Mr. Beaty relies, in part, upon *U.S. v. Williams*, 899 F.2d 898 (10th Cir.1990) which held that a prosecutor has a duty to present substantial exculpatory evidence discovered during an investigation by a grand jury. There is no basis upon which the Court can apply the *Williams* ruling to this case. This is because exhaustive hearings have been held on this issue and, upon the entire record, the Court cannot conclude that materially false information was knowingly presented to the grand jury by Special Agent MacDonald. As the Court stated in its September 1, 1989, ruling:

During the course of the hearings on these various motions, the government presented substantial documentary evidence to show that Special Agent MacDonald had conducted an extensive investigation into and performed an extensive document analysis in this case. The government's presentation was designed, in part, to refute the defense allegations that the indicting grand jury acted primarily on materially false information contained in the Bailey F.B.I. 302 statement. Substantial documentation was presented to show how the $350,000 Tenn–Ford funds were used. According to the government:

So when the grand jury, when they heard Mr. MacDonald didn't hear a vacuum,

here is what Mr. Beaty told him, this one statement. Mr. MacDonald also had available to him all of these documents, he had available to him his analysis, he had available to him interviews with other individuals, which, unless the Court tells me to, I am not going to name, there are other individuals in a position to know what had taken place as far as the trustee making the decision to settle with Congressman Ford for $25,000 on this $350,000 debt.

Having shown your Honor what I have to offer that it would have been unbelievable for a grand jury not to have thought that there was some kind of fraud in this. (Tr. p. 96, March 18, 1988)

The Supreme Court of the United States ruled, in *Costello v. United States:*

If indictments were to be held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed. The result of such a rule would be that before trial on the merits a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury. This is not required by the Fifth Amendment. An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more.

*Costello v. United States,* 350 U.S. 359, 363, 76 S.Ct. 406, 408–409, 100 L.Ed. 397 (1956). The Sixth Circuit has consistently given the *Costello* language a literal reading: "An indictment returned by a legally constituted and unbiased grand jury ... if valid on its face, is enough to call for a trial of the charge on the merits." *Short,* p. 182. In 1978, the Sixth Circuit stated:

We are especially reluctant to see the trial of criminal cases further attenuated by preliminary trials concerning the adequacy of the grand jury proceedings, a concern particularly noted in *Costello.*

*United States v. Barone,* 584 F.2d 118 (6th Cir.1978).

This issue was presented to the Court in the case of *United States of America v. Dana Kirk,* Case. No. 86–20281 (W.D.Tenn). In that case, the Court stated:

An indictment returned by a legally constituted and unbiased grand jury, if valid upon its face, is enough to call for trial of the charges on the merits. *Costello v. United States,* [350 U.S. 359], 76 S.Ct. 406 [100 L.Ed. 397] (1956); *United States v. Adamo,* 742 F.2d 927, 936 (6th Cir.1984); *United States v. Short,* 671 F.2d 178 (6th Cir.1982). The case law teaches that the word bias, as used in *Costello* refers to a grand jury which is predisposed in one way or another at the time of selection. Predisposition would exist if, for example, the cases to be considered by the grand jury involved minority group members or tax resistors and the prospective jurors were members of the Ku Klux Klan or posse Comitatus respectively. *Adamo* at 936.

The Court concludes the motion for disclosure of the grand jury testimony of Special Agent MacDonald should be and is hereby denied.

The motion of Douglas R. Beaty, joined by Congressman Harold Ford and David A. Crabtree, to renew his pre-trial motion requesting the disclosure of Special Agent Donald MacDonald's grand jury testimony is denied as to all defendants.

*Motion For Protection of Integrity of the Jury Selection Process*

Rule 18, Federal Rules of Criminal Procedure, entitled Place of Prosecution and trial, reads:

Except as otherwise permitted by statute or by these rules, the prosecution shall be had in a district in which the offense was committed. The court shall fix the place of trial within the district with due regard to the convenience of the defendant and the witnesses and the prompt administration of justice.

The Advisory Committee notes to Rule 18 cite case law supporting the proposition that there is no constitutional right to trial

within a division of a district. Included in the notes is this provision:

> The Sixth Amendment provided that the defendant shall have the right to a trial by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law ... There is no constitutional right to trial within a division (citations omitted)

Wright, Federal Practice and Procedure: Criminal 2d § 305 (2d ed. 1982 & Supp. 1990), discussing place of trial, not only states that there is no constitutional right to trial within a division of a district, but that:

> There is now developing substantial authority for the proposition that the court, in exercising its discretion about fixing the place of trial, may take into account numerous factors appearing in the particular case.

■■■■ Case law provides examples of factors illustrative of this principle for the Court's guidance. Publicity surrounding the trial is a factor, *United States v. Dickie*, 775 F.2d 607 (5th Cir.1985). The mere fact that a defendant's home is nearer one trial site than another is insufficient to merit transfer, *United States v. Afflerbach*, 754 F.2d 866 (10th Cir.1985). Adverse affect on the prompt administration of justice is a factor, *United States v. Raineri*, 670 F.2d 702 (7th Cir.1982).

The Court finds the case of *United States v. Balistrieri*, 778 F.2d 1226 (7th Cir.1985) to be significant in that it provides the Court with a procedure appropriate for application in this case. In *Balistrieri*, the judge, *sua sponte*, entered an order directing jury selection for trial of a criminal case to be conducted in one division of the district and after selection of the jury moved the trial site to another division within the district. The Court, applying Rule 18, Federal Rules of Criminal Procedure, decided to move the jury selection part of the trial to the Green Bay Division of the Eastern District of Wisconsin and, after selection of the jury, moved the case to Milwaukee for the actual trial.

This procedure has also been recognized by the American Bar Association as being appropriate in high profile cases. In its "reports with recommendations to the house of delegates," 1991 Midyear Meeting, Seattle, Washington, February 11–12, 1991, the Section of Criminal Justice made the following recommendation in Standard 8–3.5 entitled Selecting the Jury:

> (d) Whenever it is determined that potentially prejudicial news coverage of a criminal matter has been intense and has been concentrated in a given locality in a state (or federal district), the court should in jurisdictions where permissible, consider drawing jurors from other localities in that state (or district).

■■ Therefore, Rule 18 and case law interpreting Rule 18, and the American Bar Association recognize that in an appropriate high profile case, a trial judge can and may select a jury in one division of a district and proceed to trial or retrial of a criminal case in another division of the district.

The government moved the Court to order retrial of this case in another location within this district, presumably Jackson, Tennessee, which is located within the Eastern Division of the district. It is the government's contention that prejudicial publicity has so poisoned the well of jurors in this division as to make selection of an impartial jury virtually impossible. Defendants unanimously oppose the government's motion to relocate the trial. Defendants claim their homes, friends, means of livelihood, offices, files and the added financial burden are factors which justify denial of the government's motion.

■■■ The Court will grant the defendants' motion to the extent that retrial of this case will be conducted in Memphis, Tennessee, for the convenience of the defendants, witnesses and the prompt administration of justice. However, the jurors selected to retry the case will be selected from among jurors qualified to serve who are on the jury rolls in the Eastern Division of the Western District of Tennessee. Jury selection (voir dire) will be conducted in the United States Courthouse, Jackson,

Tennessee. The Court will schedule a hearing with all of the attorneys for the purpose of discussing dates, time and procedures to implement this decision. In addition, the Court will conduct discussions with appropriate court personnel and the United States Marshal to resolve logistical necessities required to carry out this decision.

Among the factors supporting the Court's decision to proceed in this manner are the following:

1) The initial trial of this case was covered day to day by an avalanche of television, radio and newspaper publicity. While this barrage of publicity could be seen, heard and read outside of the Western Division of this district, the publicity was primarily targeted to people living in the Memphis, Tennessee area.

2) There were strong indications of juror contact with outside persons or sources during the initial trial. Contact with or by jurors and outside person(s) or sources should be substantially minimized. This is because, in the Court's judgment, Eastern Division jurors will probably be, for the most part, generally unknown in Memphis, Tennessee.

3) Some persons attending the initial trial often expressed their displeasure with rulings by the Court vocally and/or with their feet. These persons often vocally expressed their support of the defense. The overall conduct of such persons was not only discourteous, but at times disorderly. Discourteous and disorderly conduct by persons attending the trial attempting to openly influence the jury should be of substantially less effect on jurors chosen from the Eastern Division of this district.

4) Two known jurors gave false and/or incomplete answers to questions asked of them during voir dire touching on their qualifications to serve as jurors.

5) After trial interviews with jurors by the FBI showed that possibly two jurors were unwilling to follow the law of the case—even after they faithfully promised to do so when questioned during the jury selection process. This type of con-

duct should not be a factor if jurors are selected from the Eastern Division of the district.

The Court thinks this procedure combined with intensive voir dire examination of prospective jurors will substantially aid the Court in the retrial of this case. It will be far less likely that jurors will be influenced by factors other than the evidence and the law that applies to that evidence.

The Court's greatest concern is that a properly selected unbiased and nonprejudiced jury will listen to the evidence in this case, listen to the law that applies to the case, deliberate with fellow jurors, and reach a fair and just decision based upon the evidence and the law, nothing more, nothing less.

### ORDER

1. The motions to dismiss the indictment in this case on double jeopardy grounds are denied.

2. The motions for judgment of acquittal are denied.

3. The motions to renew the motions for disclosure of the grand jury testimony of Special Agent Donald MacDonald, FBI, are denied.

4. The motion for an order protecting the integrity of the jury selection process is granted in part and denied in part.